[Civ. No. 22931.   First Dist., Div. Four.   Aug. 1, 1967.]

MARIN MUNICIPAL WATER DISTRICT, Plaintiff and Appellant, v. NORTHWESTERN PACIFIC RAILROAD COMPANY, Defendant and Respondent.

Leland H. Jordan, Riede & Elliott and Robert W. Elliott for Plaintiff and Appellant.

Bledsoe, Smith, Cathcart, Johnson & Rogers and Robert A. Seligson for Defendant and Respondent.

RATTIGAN, J.—This appeal involves the pleading of rights and duties incident to subjacent support of land, and a determination—apparently not heretofore made by an appellate court—of whether the common law rule of subjacent support has been modified by statute in California.

Appellant, plaintiff below and herein called "district," owned a public water system which included two pipe mains installed in the land surface on the crest of a hill. Respondent (herein "railroad") owned a railroad tunnel which ran through the hill beneath the district's mains. The tunnel collapsed, whereupon the surface land above it subsided and the mains were disrupted. The district thereafter commenced this action for damages against the railroad.

The district's complaint, setting forth the above facts, undertook to assert the railroad's liability in four counts. In one—numerically, the third cause of action—liability was based upon the railroad's alleged negligence in constructing and maintaining the underground tunnel. For reasons which we mention after deciding the appeal on its merits, the negligence count is not involved on this appeal and the complaint before us does not allege the railroad's negligence in any respect.

The appeal's merits are defined by this sequence of events in the lower court: Upon first appearance, the railroad moved to strike the first, second and fourth counts in the complaint and demurred, both generally and specially, to each. The trial court granted the motion to strike and ruled that its order striking the three counts mooted the demurrers to each. The court thereupon entered judgment dismissing the first, second and fourth counts. The appeal is from the judgment.

The record discloses, and the parties agree, that the trial court struck each of the counts mentioned upon the ground that none stated a cause of action against the railroad. The judgment of dismissal having followed, it is to be considered in the same light as a judgment upon sustaining of a general demurrer without leave to amend and, on appeal, will be subject to the same test. (*McKay* v. *County of Riverside* (1959) 175 Cal.App.2d 247, 249 [345 P.2d 949].) The question, then, is whether the first, second or fourth count states a cause of action.

The district does not allege in any count the nature or extent of its estate in the land involved. It apparently did not occupy the surface under an express grant. As to its surface ownership, it alleges alternative facts by which, the district claims, it was a lawful occupant of the surface under any of several theories, and entitled to subjacent support from the subsurface strata. It is alleged that the district is organized under the Municipal Water District Act (now § 71000 et seq., Wat. Code), and that its water mains in this case were located in a city street and in a county highway which traverse the surface above the railroad tunnel. It claims that it is lawfully a surface owner upon theories invoked by other allegations as follows:

▇ (1) In the first count, the district alleges that its water mains were "placed, owned and maintained" in the surface highways under claim of right and without protest from the railroad for more than five years. It claims an estate in the surface by adverse possession. There is no allegation, however, that the pipes are located in any property of the railroad, and various other allegations import to the contrary. Therefore, the complaint does not sustain the district's claim to surface ownership by adverse possession.

▇ (2) On the same facts, the district claims status as a surface owner by "inverse condemnation," subject only to the right of the railroad to be compensated. (*Provident Irr. Dist.* v. *Cecil* (1954) 126 Cal.App.2d 13, 17 [271 P.2d 157].) But, again, no allegation places the district's water mains in or upon property of the railroad as an "inverse condemnee"; and, again, this theory of surface ownership will not apply.

▇ (3) In the second count, the district alleges that its water mains are lawfully located because they are in public highway easements on the surface. Under these allegations, the district had the right to install its mains in the street and

in the highway under the Municipal Water District Act. (Wat. Code, § 71697.)[1] Exercising its right, it became a lawful occupant of the land surface.

(We note that some of the few authorities dealing with support of land state that even a surface trespasser is entitled to it. (5 Powell, Real Property, § 699, pp. 287-288; Rest., Torts, § 820, subd. (1), com. g.) We do not so hold, but neither do we establish as the law of the case that the district had to be a ''lawful'' occupant of the surface in order to be entitled to subjacent support from the subsurface. In commenting upon the district's claims enumerated above, we are responding to the allegations in the complaint before us.)

■ The complaint—and we refer hereinafter to the second count—does not allege, either, the nature or extent of the railroad's ownership of the subsurface: it alleges only that the railroad owned a tunnel through the hill and beneath the district's water mains. The complaint contains no allegations, however, under which the railroad is shown to have owned any part of the land *surface* involved, adjoining the district's occupancy or otherwise. Accordingly, for purposes of stating a cause of action under the law of subjacent support, the complaint sufficiently alleges that the railroad is a subsurface owner.

■ Again, the complaint is less than explicit as to whether the tunnel is an artificial excavation in the hill and whether the railroad did the excavating. However, from the structure depicted in common usage of the term ''railroad tunnel,'' from various references to its ''construction'' and to the right of the railroad ''to construct'' a tunnel, and from allegations that ''at all times'' the railroad owned, possessed and controlled the tunnel, we find the fair import of an allegation that the tunnel in question was excavated by the railroad, and that the tunnel was constructed in the subsurface before the district's mains were installed in the surface.

Thus, although the complaint is replete with uncertainties and inferential pleading, it alleges that the railroad, acting as a subsurface owner, excavated an underground tunnel; that, after the tunnel was built, the district installed its water

---

[1] ''71697. The right is hereby granted to locate, construct, and maintain district works along and across any street or public highway and on any lands which are now or hereafter owned by the State; and a district has the same rights and privileges appertaining thereto as have been or may be granted to cities within the State.''

mains in the land surface above the tunnel; and that the tunnel subsequently collapsed, causing subsidence and the district's damage.

At common law, where one person owns the surface of land and another the subjacent land, the owner of the surface is entitled to have it remain in its natural condition, without subsidence by reason of the subsurface owner's withdrawal of subjacent support. (Rest., Torts, § 820; 3 Tiffany, Real Property (3d ed. 1939) § 754, p. 196; 5 Powell, Real Property (1962) § 703, p. 308; 2 Thompson, Real Property (4th ed. 1961) § 415, p. 646; VI-A Amer. Law of Property (1954) § 28.36, pp. 99-100; *Humphries* v. *Brogden* (1850) 12 Q.B. 739, 744-745 [116 Eng. Rep. 1048, 1050] ; and see *Empire Star Mines Co.* v. *Butler* (1944) 62 Cal.App.2d 466, 533-534 [145 P.2d 49].)

The same authorities agree that the common law right of subjacent support is closely analogous to that of lateral support (e.g., 3 Tiffany, *supra,* § 754, pp. 196-197 ; 5 Powell, *supra*) ; each of two of the treatises concurs to the extent that each treats the two subjects together. (2 Thompson, *supra,* § 415, p. 640; VI-A Amer. Law of Property, *supra.*) Under all the authorities, also, the common law obligation of subjacent support is "absolute." (E.g., Rest., Torts, *supra,* § 820, subd. (1), com. *b*; 5 Powell, *supra*; 2 Thompson, *supra.*) The authorities—California courts included—also agree that the common law obligation of lateral support is similarly "absolute." (*Wharam* v. *Investment Underwriters* (1943) 58 Cal.App.2d 346, 349 [136 P.2d 363] ; Rest., Torts, § 817, subd. (1), com. b; 5 Powell, *supra,* § 699, p. 290; 2 Thompson, *supra,* § 415, p. 642.)

"Support is lateral when the supported and supporting lands are divided by a vertical plane. Support is subjacent when the supported land is above and the supporting land is beneath it. Such is the situation when one person owns an upper stratum of land and another person owns a stratum under it. It most frequently arises from a transfer of minerals in place, the rest of the land being retained, or from a transfer of the land, excepting the minerals." (Rest., Torts, ch. 39, "Scope and Introductory Note," p. 183; *accord,* 5 Powell, *supra,* § 703, p. 308.)

On this appeal, the district contends that the common law rule of absolute liability for deprivation of subjacent support is still in effect in California, unmodified by statute, and that

its complaint states a cause of action at common law. The railroad asserts that the Legislature changed the common law rule by enacting Civil Code section 832 (hereinafter "section 832"). From this premise, the railroad argues in substance that the complaint does not state a cause of action because it does not allege that the excavator of the tunnel failed to give notice of the excavation or to use ordinary care in excavating, both of which are required by section 832.

In its present form,[2] section 832 relieves an excavating

---

[2] As originally enacted in 1872, the statute read: "Each coterminous owner is entitled to the lateral and subjacent support which his land by nature receives from the land of the other."

In 1874, section 832 was amended to read: "832. Each coterminous owner is entitled to the lateral and subjacent support which his land receives from the adjoining land, subject to the right of the owner of the adjoining land to make proper and usual excavations on the same for the purposes of construction, on using ordinary care and skill and taking reasonable precautions to sustain the land of the other, and giving reasonable notice to the other of his intention to make such excavation."

The present text of the statute was enacted by amendment in 1931. As then amended and expanded, it provided, and now provides, as follows:

"832. Each coterminous owner is entitled to the lateral and subjacent support which his land receives from the adjoining land, subject to the right of the owner of the adjoining land to make proper and usual excavations on the same for purposes of construction or improvement, under the following conditions:

"1. Any owner of land or his lessee intending to make or to permit an excavation shall give reasonable notice to the owner or owners of adjoining lands and of buildings or other structures, stating the depth to which such excavation is intended to be made, and when the excavation will begin.

"2. In making any excavation, ordinary care and skill shall be used, and reasonable precautions taken to sustain the adjoining land as such, without regard to any building or other structure which may be thereon, and there shall be no liability for damage done to any such building or other structure by reason of the excavation, except as otherwise provided or allowed by law.

"3. If at any time it appears that the excavation is to be of a greater depth than are the walls or foundations of any adjoining building or other structure, and is to be so close as to endanger the building or other structure in any way, then the owner of the building or other structure must be allowed at least thirty days, if he so desires, in which to take measures to protect the same from any damage, or in which to extend the foundations thereof, and he must be given for the same purposes reasonable license to enter on the land on which the excavation is to be made or is being made.

"4. If the excavation is intended to be or is deeper than the standard depth of foundations, which depth is defined to be a depth of twelve feet below the adjacent curb level, at the point where the joint property line intersects the curb and if on the land of the coterminous owner there is any building or other structure the wall or foundation of which goes to standard depth or deeper then the owner of the land on which the excavation is being made shall, if given the necessary license to enter on the adjoining land, protect the said adjoining land and any such building or other structure thereon without cost to the owner thereof, from any

*surface owner* from the absolute duty to provide *lateral* support to the land of a coterminous surface owner, provided he gives notice of the excavation to his neighbor and exercises ordinary care in excavating, both as required by the statute. To this extent, the statute relaxes the common law duty of lateral support. (*Wharam* v. *Investment Underwriters, supra,* 58 Cal.App.2d at p. 349; *Puckett* v. *Sullivan* (1961) 190 Cal.App.2d 489, 494-495 [12 Cal.Rptr. 55, 87 A.L.R.2d 704]; see Comment (1920) 20 Cal.L.Rev. 62, 63.) Since the common law rule of lateral support is relaxed by reason of the statute's provisions for notice and the exercise of ordinary care, the relaxation occurred when these provisions were added to section 832 in 1874. In a lateral support case between coterminous surface owners, the applicability of section 832 could depend upon the date the excavation was made, i.e., before or after the 1874 amendment. The district's position here is that the statute did not and does not operate to change the common law rule of *subjacent* support at all.

If this is so, the date that the tunnel was constructed is not relevant to whether the complaint before us states a cause of action. And, if section 832 is inapplicable as the district contends, we should so hold in reviewing the complaint because, under the law of the case thus established, the facts of notice of the railroad tunnel excavation—if given—and ordinary care in excavating—if exercised—are not available as affirmative defenses to a complaint which alleges neither.

We have seen that the complaint alleges a loss of surface support incurred by a supported surface owner from a supporting owner underneath, and not that the supporting owner—the railroad—owns any part of the surface adjoining the district's occupancy there. Consequently, no element of lateral support is presented: this is a ''pure'' subjacent support case. As such, it has no precedent among the California decisions, all of which—with the possible exception of *Porter* v. *City of Los Angeles* (1920), hereinafter discussed— deal with lateral support obligations and coterminous surface owners only.

We hold that section 832 applies only as between coterminous surface land owners, and only to their mutual obligation of lateral support. Although the statute thus

damage by reason of the excavation, and shall be liable to the owner of such property for any such damage, excepting only for minor settlement cracks in buildings or other structures.''

applied relaxes the common law, it does not apply as between a surface owner and a subsurface owner and it does not change the common law duty of subjacent support owed to the surface by the subsurface. Several reasons direct this conclusion.

First: Such authorities as have considered section 832 in lateral support cases appear to assume that the statute deals only with the lateral support obligation existing between coterminous surface owners of land. *"All that* [section 832] *does* is to permit a land owner to excavate, freed from the absolute common law right of *lateral* support in his neighbor, provided certain conditions in the code section are complied with, and always provided that negligence of the excavator is not the proximate cause of damage to the property of the adjoining land owner." (Italics added.) (*Wharam* v. *Investment Underwriters, supra,* 58 Cal.App.2d at p. 349; *Sager* v. *O'Connell* (1944) 67 Cal.App.2d 27, 32 [153 P.2d 569] ("The common law rule of *lateral* support is found in Civil Code section 832: . . .") (Italics added); *Puckett* v. *Sullivan, supra,* 190 Cal.App.2d at pp. 494-495.)

*Porter* v. *City of Los Angeles* (1920) 182 Cal. 515 [189 P. 105], is the single California case dealing, even in part, with subjacent support as such. In *Porter,* the plaintiff was the owner of an improved lot fronting on a city street under which the defendant city excavated a tunnel. In her action for negligent deprivation of support, the court held that the city was under a duty to use ordinary care in constructing the tunnel. The critical question, though, was the applicable statute of limitations. The complaint pleaded negligence. The *Porter* court indicated that the city would be liable for negligence but that its negligent act was a trespass upon plaintiff's property governed by the statute of limitations in a trespass action rather than in a negligence action.

The *Porter* decision does not hold that section 832 controls all relationships between owners of the surface and the subsurface. To the contrary, the *Porter* court implied (182 Cal. at p. 520) that the plaintiff was a coterminous surface owner entitled to lateral support *next to* the street, and a surface owner entitled to subjacent support *in* the street; and that her coterminous rights existed by reason of section 832 ("under the code") but that her surface rights did not.

Second: Section 832 declares the entitlement of a *"coterminous* owner . . . to the . . . support which his land receives

from the *adjoining* land. . . ." (Italics added.) "Coterminous" is defined as "having the same or coincident boundaries." (Webster's New International Dictionary (3d ed. 1967) p. 516.) "Adjoining" means "touching or bounding at some point or on some line." (*Op. cit.*, p. 27.) The principal legal dictionaries define "adjoining" in virtually identical language: "The word in its etymological sense means touching or contiguous, as distinguished from lying near to or adjacent." (Black's Law Dictionary (4th ed. 1951), p. 62; Bouvier's Law Dictionary (3d rev. 1914) ; Ballentine's Law Dictionary (2d ed. 1948) p. 36.)

Thus, "coterminous" and "adjoining" each imports physical contiguousness at a common boundary. Such is characteristic of surface ownerships of land. On the surface of the planet, a precisely drawn boundary is necessary as a limitation upon otherwise unlimited occupancy and use on either side. On the surface, a precise boundary can feasibly be drawn as a visible line on an accessible horizontal plane. Contiguousness at a common boundary is not characteristic of the relationship between surface and subsurface ownerships. Ordinarily, the nature and extent of a granted underground use, not a precise boundary, limits occupancy and use at the subsurface level. A precise boundary is thus not necessary, and it cannot feasibly be drawn below ground because it would be an invisible plane through an impenetrable solid.

Since "coterminous" and "adjoining"—each by definition—are characteristic of surface ownerships only, the nomenclature of section 832 appears to limit the statute to surface ownerships.

Third: The entirety of section 832 indicates that it is intended to apply to lateral support obligations existing between surface owners only. It applies to excavations "on" land, and not, in terms, underneath it. The notice to be given by an excavator must state "the depth *to which* such excavation is intended to be made" (italics added), which imports an opening *from* the surface rather than under it. If the notice were to apply to a tunnel beneath the land to be protected, it would properly specify the level or elevation of the tunnel excavation as well as its "depth." Manifestly, the section's subparagraphs numbered 3 and 4 apply to surface owners only.

Fourth: Since 1872, section 832 has appeared in division 2, part 2, title 3, chapter 1 of the Civil Code, in article 1 under

94

the article heading "Boundaries." An article heading is an integral part of the code and is to be given effect according to its import. (*Lynch* v. *Lynch* (1924) 69 Cal.App. 66, 69 [230 P. 462].) The same is true of chapter and section headings. (*Gonzales* v. *Superior Court* (1935) 3 Cal.2d 260, 263 [44 P.2d 320].) As we have seen, the term "boundaries" is characteristic of adjoining surface ownerships of land. Its use as the heading of article 1 suggests that the full article— section 832 included—is intended to apply to surface owners only.

The suggestion develops conviction from the language of the other sections in article 1 under "boundaries." Since 1872, section 832 has appeared in the article with the same companion sections. (Civ. Code, §§ 829-831, 833, 834.) The first among them, section 829,[3] explicitly refers to "the surface." The language of section 829 extends the rights of fee ownership beneath the surface, which strongly implies that the section—and all of article 1, which it introduces—is not addressed to vertically separated ownerships at all. Each of the remaining sections in article 1 clearly applies only to a surface owner,[4] or only as between surface owners.[5] None of the remaining sections in article 1 could, in fact, possibly apply to a situation involving a subsurface owner. Since section 832 was thus placed in a statutory context which otherwise deals exclusively with surface owners and their relationships, it appears that the Legislature did not intend section 832 to apply to ownerships beneath the surface.

Fifth: The subject of subjacent support of land has been principally encountered in the law of mining, one of its problem areas. (See Rest., Torts, p. 183, quoted *supra*; 5 Powell, *supra*, § 703, p. 308 et seq.; 2 Thompson, *supra*, § 415, p. 645

[3] "829. The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it."

[4] "830. Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tide-water, takes to ordinary highwater mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream."

"831. An owner of land bounded by a road or street is presumed to own to the center of the way, but the contrary may be shown."

[5] "833. Trees whose trunks stand wholly upon the land of one owner belong exclusively to him, although their roots grow into the land of another."

"834. Trees whose trunks stand partly on the land of two or more coterminous owners, belong to them in common."

et seq.; 3 Lindley, Mines (3d ed. 1914) § 812, pp. 2004-2005; 2 C.J.S., Adjoining Landowners, § 26, p. 28; 58 C.J.S., Mines and Minerals, § 278, pp. 783 et seq.) The Legislature that enacted section 832 in 1872, and the one that amended it in 1874 to relax the common law rule of lateral support, were cognizant of subjacent support problems, a prior Legislature having enacted a surface-protection statute affecting mining operations as early as 1855.

The early law was not addressed or limited to subterranean mining as such, but its language[6] demonstrates legislative intent to protect the subjacent support of land against mining below ground. The language also manifests legislative recognition that surface and subsurface estates in land could be— and, in a state newly created by miners among others, frequently were—held in separate ownership. The code commission which recommended enactment in 1872 of the Civil Code also specifically recommended the codification of the 1855 mining law in the same code. The 1872 Legislature adopted the one in the Civil Code, but not the other.[7] From the historical context, it appears that the Legislature's apparent

---

[6]The 1855 law (Stats. 1855, ch. 119, p. 145, provided in relevant part as follows (§ 1):

"No person shall for mining purposes, destroy or injure any growing crops . . . , nor *undermine* . . . any house, building improvement, or fruit trees, standing upon . . . the *property of another*, . . ." (Italics added.)

Its second section provided for an advance indemnification procedure to be followed "Whenever any person, for mining purposes, shall desire to occupy or use any mineral lands . . . , then occupied by such growing crops . . . , houses, buildings or other improvements, *property of another*, . . ." (Italics added.)

[7]The commission's recommendations were submitted to the Legislature in a draft Civil Code published by legislative direction in 1871. (Code Commission, Revised Laws of the State of California—Civil Code. (State Printer, 1871.) See *id.*, § 832. For the recommendation that the 1855 mining law be codified therein, see *id.*, § 1409 et seq., and commissioners' note, p. 285.) The 1855 mining law (Stats. 1855, ch. 119, p. 145) was not included in the Civil Code as enacted, and remained in effect as an uncodified law until 1933, when the Legislature repealed it as "obsolete." (Stats. 1933, ch. 25, p. 295; *id.*, Appendix, p. 3289.)

The 1871 commission itself was unquestionably versed in the problems of subjacent support of land in mining operations. Charles Lindley, one of its three members, was a pioneer mining lawyer in California and Nevada. Curtis H. Lindley, his son and later the author of Lindley on Mines, became the commission's secretary in early 1872. History's full circle may be closed with the note that one of the younger Lindley's notable accomplishments in later life was the organization of the Marin Municipal Water District, appellant herein. (Colby, *Curtis Holbrook Lindley* (1850-1920) 9 Cal.L.Rev. 87.)

limitation of section 832 to surface ownerships—in 1872 and 1874 alike—was an act of deliberation and not an accident. ·

The Legislature, in enacting and amending section 832, had good reason to relax the common law rule of lateral support as between the coterminous surface land owners to whom it applies. The rule had become burdensome and unrealistic among changing conditions involving the growth of urban communities, the proliferation of surface ownerships as population increased, and the commonplace necessity of surface excavation for building purposes. The need for its relaxation was "early perceived in California" (*Wharam* v. *Investment Underwriters, supra,* 58 Cal.App.2d 346, 349), and section 832 codifies its relaxation. (*Ibid.*) No such reason dictated a relaxation of the obligation of subjacent support owed at common law by a subsurface owner: the need for protection of the surface, in fact, has increased as the importance of such subsurface activities as mining—and, for that matter, railroad tunneling—has declined in modern times.

In a given set of facts involving coterminous surface land owners, depending upon elements of topography and surface location and upon the pull of gravity in any case, "lateral support" and "subjacent support" can mean practically the same thing. In other situations, a single surface owner can be entitled to both. (*Porter* v. *City of Los Angeles, supra,* 182 Cal. at p. 520.) Accordingly, when the Legislature mentioned "subjacent support" in section 832, it used the term only as it might apply to a surface owner. That the term was used does not extend the statute to the subsurface owner to whom it *does* apply.

We have seen that, according to the allegations in the complaint, the district's water mains were installed in the land surface—i.e., the district became a surface owner—after the railroad had excavated the tunnel in the subsurface. This sequence is not fatal to the district's cause of action for deprivation of surface support. ▮ The surface owner's cause of action arises when the land subsides, not when the excavation is made. (Rest., Torts, § 820, subd. (1), com. f; *id.,* § 817, subd. (1) com. i; 2 Thompson, *supra,* § 415, p. 647; VI-A Amer. Law of Property, § 28.48, p. 134; 3 Lindley, *supra,* § 823, pp. 2016-2017.) It has been so held in the lateral support cases in California. (*Veterans' Welfare Board* v. *City of Oakland* (1946) 74 Cal.App.2d 818, 831 [169 P.2d 1000].) A surface owner of land in California is entitled to

lateral support although the offending excavation was made before he acquired title. (*Conlin* v. *Coyne* (1937) 19 Cal.App. 2d 78, 89 [64 P.2d 1123].) This rule is consonant with the authorities' invariable description of the right of subjacent support as a "natural" property right, which is unaffected with any element of foreseeability associated with liability for negligence.

▆▆ The railroad contends that it is not liable to the district because even the common law rule of subjacent support extends only to surface land in its "natural condition" and thus—in the absence of negligence—does not protect the district's water mains because the latter were "structures." So far as the statement goes, it appears to recite the common law rule. (3 Tiffany, *supra*, § 754, p. 197; VI-A Amer. Law of Property, § 28.45, p. 130.) But the common law right to support is not lost by the imposition of structures unless the downward pressure of their artificial weight contributes to the subsidence. (5 Powell, *supra*, § 703, pp. 308-309.) The California lateral support cases so hold. (*Wharam* v. *Investment Underwriters*, *supra*, 58 Cal.App.2d 346, 350; *C. F. Harper Co.* v. *DeWitt Mortg. & Realty Co.* (1931) 115 Cal.App. 15, 20-21 [300 P. 839].) In this regard, the burden of showing that the structures' weight contributed to the subsidence rests upon the defendant. (5 Powell, *supra*.) Only a complaint is before us. Therefore, the railroad's contentions as to "structures" are a matter of affirmative defense and proof.

▆▆ In the second count of its complaint, the district alleges itself to be a surface owner deprived of subjacent support by reason of an excavation made by a subsurface owner. Since the common law rule of subjacent support is applicable, the second count states a cause of action and the judgment as to that count should be reversed.

▆▆ The fourth count, thus far not mentioned, purports to plead a cause of action based upon strict liability for ultrahazardous activity. Attempting to do so, it repleads the allegations of the first and second counts—which do not allege negligence—and adds only the bare conclusion that "construction and maintenance of said tunnel was at all times inherently dangerous" to the surface above it. ▆▆ Under the rule of "absolute" liability for ultrahazardous activity, as established in California by the decision in *Green* v. *General Petroleum Corp.* (1928) 205 Cal. 328 [270 P. 952, 60 A.L.R.

475], the "important factor is that certain activities under certain conditions may be so hazardous to the public generally, and of such relative infrequent occurrence, that it may well call for strict liability as the best public policy." (*Luthringer* v. *Moore* (1948) 31 Cal.2d 489, 500 [190 P.2d 1].) Whether a given case is a proper one for imposing strict liability is a question of law. (*Luthringer* v. *Moore, supra,* 31 Cal.2d at p. 496.) The fourth count alleges no facts bringing the railroad tunnel within the rule, and we are unable to hold as a matter of law that subterranean tunneling, without negligence, is so hazardous—if hazardous at all—as to warrant the rule's application here. Accordingly, the fourth count does not state a cause of action.

We have previously indicated that the third count of the original complaint, which sounds against the railroad in negligence, is not before us. This is because of the full sequence of unusual events in the trial court. When it first appeared, the railroad demurred to the negligence count both generally and specially, but did not move to strike it. The trial court overruled the general demurrer and sustained the special demurrer with leave to amend within a time specified. The court's action left the third count in a viable—and amendable—condition. The district, choosing at the time to challenge the trial court's action striking the other counts, dismissed the third count *without prejudice* and appealed from the judgment dismissing the others.

When the appeal reached this court (1 Civ. 20624), it was dismissed on the railroad's motion because an appellate decision would have been a "piecemeal" disposition of the case while the third count was in effect pending in the trial court. On motion there, the district then obtained leave to reinstate the third count and filed an amended complaint for negligence. The railroad responded with a voluminous answer and the case thereafter stood at issue as a negligence action only. A full two years later, the district changed its mind and dismissed its amended complaint—and, thereby, the third count for negligence—*with* prejudice. The district is back in this court on appeal from the judgment which originally dismissed the other counts, but without the "piecemeal" defect of the abortive earlier appeal.

We mention this tortuous history because its effect has been to limit our review to the first, second and fourth counts of the original complaint. The parties have ignored any such

limitation: the record transmitted to us includes the subsequent pleadings which we may not properly consider, and both briefs have argued facts which do not appear in the original complaint. Such facts include an allegation and an argument, by the railroad, that it is not liable because the tunnel's collapse was the result of an intervening cause not connected with its obligation of subjacent support. We cannot and do not so hold, because *the complaint before us* makes no allegation that there was an intervening cause of the tunnel's collapse. We deem it necessary to state this further limit upon our decision so that the parties, not having recognized the limitations upon this appellate review, will not misconstrue the law of the case thus far established.

The judgment dismissing the second cause of action set forth in the complaint herein is reversed, and the trial court is directed to make rulings on the demurrers thereto consistent with the views herein expressed.

The judgment dismissing the first and fourth causes of action in the complaint is affirmed.

Each party shall bear its own costs on appeal.

Devine, P. J., and Christian, J., concurred.

A petition for a rehearing was denied August 30, 1967, and the opinion and judgment were modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied September 27, 1967.