[Sac. No. 5877.  In Bank.  Feb. 24, 1948.]

ALBERT L. LUTHRINGER, Plaintiff and Appellant, v. R. L. MOORE et al., Respondents; R. L. MOORE, Defendant and Appellant.

Butler & Reckers and Stanley W. Reckers for Plaintiff and Appellant.

Busick & Busick and Charles O. Busick for Defendant and Appellant.

Van Dyke & Harris, Gerald M. Desmond, Henry & Bedeau, Grover W. Bedeau and J. A. Montgomery for Respondents.

CARTER, J.—Plaintiff recovered a judgment on a verdict for damages for personal injuries against defendant, R. L. Moore. Plaintiff stated his action in two counts, the first predicated upon an absolute liability or liability without fault, and the second, alleged negligence of defendants. The defendants are Bedell, the tenant of the restaurant building hereafter mentioned and the operator of the restaurant therein, Sacramento Medico-Dental Building Company, a corpora-

tion, the owner of the office and restaurant buildings, and Moore, an individual engaged in the pest eradication business. A nonsuit was granted as to all defendants as to the second count in the complaint. Bedell and Medico-Dental Building Company were exonerated. ██ Plaintiff appeals from the unfavorable result as to those defendants but advises this, court that he urges that appeal only in the event the judgment is reversed as to Moore who is the only appealing defendant. In view of the result (affirmance of the judgment) reached herein we will treat plaintiff's position as an abandonment of his appeal, and accordingly, it is dismissed.

From the foregoing it is apparent that we have presented, the question of whether Moore was absolutely liable for the injury—was liable without fault—whether the doctrine of strict liability is applicable.

The locale of the accident giving rise to the action is commercial buildings in the business district of the city of Sacramento. Defendant, Sacramento Medico-Dental Building Company, is the owner of two contiguous buildings, one a 10-story concrete office building and the other a restaurant building. Tenants of that defendant occupy the buildings. Beneath the first floor of both buildings are basement rooms. They are connected by passageways. A room on the street level floor of the office building was occupied by a tenant Flynn in which he conducted a pharmacy. There was also a dress shop on that floor. A restaurant occupied the restaurant building. Flynn's store was adjacent to the main entrance lobby of the office building.

Defendant Moore was engaged to exterminate cockroaches and other vermin in the basement under the restaurant and that part under the dress shop. He made his preparations and released hydrocyanic acid gas in those rooms about midnight on November 16, 1943. Plaintiff, an employee of Flynn in the latter's pharmacy, in the course of his employment, arrived at the pharmacy about 8:45 a. m. on November 17, 1943, with the purpose of opening the store. Although there is a conflict in the evidence, there is testimony that none of the three entrances to the drugstore bore any signs or notices warning of the presence or danger of the above mentioned gas. The evidence is clear that there was none on the door used by plaintiff. He entered by a door from the office building lobby. He was suffering from a cold. After entering the store he proceeded to a small mezzanine floor to put

on his working clothes. Feeling ill he returned to the main floor and lost consciousness. He was discovered in that condition by Flynn's bookkeeper who arrived at the pharmacy between 9:15 and 9:30 a. m. Plaintiff was removed from the store, treated by the firemen of the city with a resuscitator and taken to the hospital where he received medical attention. He was found suffering from hydrocyanic acid gas poisoning and his injuries are from that source.

Counsel for defendant Moore contends that the evidence is insufficient to justify the verdict in favor of plaintiff. He asserts that there is no evidence of the escape of hydrocyanic acid gas from the basement to the pharmacy or the presence of such gas when plaintiff was there; that there is no evidence that plaintiff suffered from such gas poisoning on the morning in question or that his condition since was due to such poisoning.

It is beyond dispute that Moore released the gas in the basement of the building the night preceding the morning of plaintiff's injury. It is unlikely that such lethal gas was present and released at any other place in the vicinity. The evidence shows the gas is lighter than air, readily diffuses in air, is very penetrating and in the language of witness Bell: ''It will penetrate behind baseboards, cracks and crevices that we couldn't get at with any type of liquid insecticide. It will go through mattresses, chesterfields, furniture, some types of porous walls. Q. It does a good job of fumigating? A. That's right. Q. Because it can get into small cracks and apertures? A. That's right.'' It has a bitter almond odor. The bookkeeper who found plaintiff testified that her throat burned and she had to cough after entering the store; that although she did not detect the characteristic odor of the gas on the day of the injury she did detect it on the mezzanine floor of the pharmacy on the following day. Witness Edwards who was in the lobby of the office building about 8 a. m. on the morning plaintiff was injured, testified that he smelled the bitter almond odor. Witness Willis, an employee in the pharmacy, stated he detected the odor in the pharmacy later in the day—the same odor he had noticed when he arrived in the morning but did not enter the pharmacy. One of the firemen who endeavored to revive plaintiff after he was removed from the pharmacy testified that he smelled the odor of the gas and that, ''his clothes were saturated with it.'' When plaintiff arrived at the hospital he was examined and treated by a doctor who testified that

plaintiff had "a sweetish odor on his breath," the same odor he noticed later in the morning about the elevator in the office building after he left the hospital and went to his office in that building. Dr. Schofield was called by defendant Moore and informed by him that plaintiff had been overcome by gas fumes and should be treated. The doctor was at the hospital where plaintiff was taken but could not examine him immediately. He examined him at 11:35 a. m. He found the gas odor on plaintiff's breath. He unequivocally diagnosed plaintiff's condition to be caused by cyanide gas poisoning.

The foregoing evidence points unerringly to the conclusion that there was cyanide gas in the pharmacy; that it came from the fumigation operation in the basement; and that plaintiff was poisoned by such gas. Moore's arguments with reference to the care used to confine the gas, the failure of some persons to detect any gas odor, the possibility that the presence of gas in the lobby of the office building and elsewhere was due to the gas being blown from the restaurant by Moore and the like, pose nothing more than conflicts in the evidence.

Moore alleges error in the giving of the instruction reading: "I instruct you that any person engaging in an ultra-hazardous activity, who knew, or in the exercise of reasonable care, should have known its ultra-hazardous character, and thereby proximately causes injury to another by a miscarriage of such activity, is liable to the person harmed, unless the latter knew or in the exercise of reasonable care should have known its ultra-hazardous nature and failed to exercise reasonable care for his own safety, or unless he knowingly and voluntarily invited the injury, and brought it upon himself.

"Likewise, any person, firm or corporation who brings, or permits to be brought upon its premises that which is of an ultra-hazardous nature, and who knew, or in the exercise of reasonable care should have known its ultra-hazardous nature, is liable for any injury proximately caused another, by its miscarriage, unless the person so harmed knew, or in the exercise of reasonable care should have known of its ultra-hazardous nature and failed to exercise reasonable care for his own safety or unless he knowingly and voluntarily invited the injury, and brought it upon himself.

"This principal of the law does not require a finding of negligence upon those so engaging in such activity, or upon those bringing or permitting it to be brought upon the premises.

"I instruct you as a matter of law that under all the facts and circumstances of this case, the use and release of

hydrocyanic acid gas by the defendant Moore, in the premises of defendants Bedell and Sacramento Medico-Dental Building, a corporation, all as appears in the evidence, constituted an ultra-hazardous activity.'' He asserts that it advised the jury on questions of fact, such as that gas did escape from the basement to the pharmacy which was present when plaintiff entered the pharmacy, and such condition was unknown to plaintiff; that plaintiff came in contact with the gas and became ill therefrom, and that plaintiff was acting in the course of his employment when he entered the pharmacy. Suffice it to say, a mere reading of the instruction refutes Moore's argument. In any event, the jury were fully instructed on proximate cause and fully informed with relation to ultra-hazardous activities (later discussed) as follows: ''You are instructed that defendant R. L. Moore, doing business as 'Orchard Supply Company,' was engaged under all the facts and circumstances of this case in what the law considers to be an ultra-hazardous activity when he used hydrocyanic acid gas to fumigate the connected basement rooms which have been referred to as Bedell's storeroom and the Superintendent's office, the latter being located in the basement of the Medico-Dental Office Building. A person who carries on an ultra-hazardous activity is liable to another whom the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting to said person from that which makes the activity ultra-hazardous, although the utmost care is exercised to prevent the harm, unless the person injured knew or in the exercise of reasonable care should have known its ultra-hazardous nature and fails to exercise reasonable care to avoid the harm threatened thereby after acquiring knowledge that the ultra-hazardous activity is being carried on and after it has miscarried or is about to miscarry. In the present case, if you find from a preponderance of the evidence that defendant R. L. Moore, doing business as 'Orchard Supply Company,' should have recognized that persons in nearby parts of the Medico-Dental Office Building were likely to be harmed if hydrocyanic acid gas escaped from the rooms being fumigated and that hydrocyanic acid gas did in fact escape and find its way to the Medico-Dental Pharmacy premises thereby coming in contact with and causing harm to the plaintiff Albert L. Luthringer, unless you also find from a preponderance of the evidence that plaintiff Albert L. Luthringer knew

or in the exercise of reasonable care should have known that fumigation with hydrocyanic acid gas was being carried on and that the gas had escaped or was about to escape to the pharmacy premises and then failed to exercise reasonable care to avoid the harm threatened, or unless he knowingly and voluntarily invited the injury and brought it upon himself, your verdict must be for the plaintiff Albert L. Luthringer and against defendant R. L. Moore, doing business as 'Orchard Supply Company.' ''

In connection with the foregoing it is urged that the instructions declare as a matter of law that the release of such gas on the premises constitutes an ultrahazardous activity. It appears to be settled that the question of whether the case is a proper one for imposing absolute or strict liability is one of law for the court. (See *Green* v. *General Petroleum Corp.*, 205 Cal. 328 [270 P. 952, 60 A.L.R. 475]; *Munro* v. *Pacific Coast Dredging etc. Co.*, 84 Cal. 515 [24 P. 303, 18 Am.St.Rep. 248]; Rest., Torts, § 520, com. h.)

Turning to the question of whether absolute or strict liability is appropriate in the instant case, we find that according to witness Bell (a man engaged in the pest control business), there are only three operators licensed to use lethal gas in pest control in Sacramento. And in regard to the nature of hydrocyanic acid gas he testified: ''Q. Do you know whether hydrocyanic acid gas is a poisonous gas or a lethal gas? A. It definitely is. Q. By lethal, you mean it is deadly, or causes death? A. That's right. . . . Q. How about the quantities of it that are required to cause death to animals or human beings? A. Minimum amount would be about 300 parts per million, would be a lethal dosage. Q. The amount to 300 parts by volume. A. Yes sir. Q. Per volume of air? A. Yes, sir. Q. That amount would be lethal to human beings? A. That is correct. Q. Do you know how long a time would be required? A. It would take very little time with that amount. Q. Can you tell us what the physical characteristics of hydrocyanic acid gas are? A. It is a little lighter-than-air gas; a very highly penetrative gas; susceptible to moisture quite a bit, it will follow moisture; it is noninflammable; the flash point is very low so that it can be used without very much hazard of fire. Q. It is lighter than air? A. Yes, sir. Q. What about the diffusion quality of it? If you put it in a room with air, does it diffuse? A. If the air is warm, it will very rapidly. If the temperature is

low, it will not diffuse so rapidly. Q. I think you said the gas was very penetrative? A. Definitely. Q. What do you mean by that? A. That is one of the advantages of the gas; why they use it in fumigation. It will penetrate behind baseboards, cracks and crevices that we couldn't get at with any type of liquid insecticide. It will go through mattresses, chesterfields, furniture, some types of porous walls. Q. It does a good job of fumigating? A. That's right. Q. Because it can get into small cracks and apertures? A. That's right. Q. Is it difficult to keep that gas confined? A. Yes, because of the fact it will penetrate, you have to be careful to keep it in a definite area. Q. In fumigation, what is your practice? You prepare a room so as to keep the gas confined as far as possible? A. You have to seal all the cracks around doors and windows; any holes around plumbing outlets; pack up the trim on the sinks, tape them off; on a regular fumigation they make a paste for that that is used. Sometimes we will use patching plaster; mostly through the use of a tape, because you tear it off in strips; depending on the width of the crack; pack the ventilator openings; wires; anything with any kind of a crack at all should be sealed. Q. In the ordinary operation, if you go in and seal up so that you consider it is adequately sealed, you still have some leakage of gas, or not? A. You will have some, yes, sir, unless it is a very well built building. Q. I see. What is your practice with reference to adjoining premises or adjoining parts of the same building? A. In fumigating the building, the tenants from an individual building, when you are fumigating any part of it, should be vacated. Q. All parts of the building? A. Yes, sir. Q. What is the reason for vacating other parts of the building that you do not fumigate? A. The operator going into a building isn't too familiar with the construction of the building. There might be a hidden flue and cracks some place you might miss. If you did miss that, the people above the area would be fumigated. That gas might leak up there. They would be subject to being gassed that way. The safest way is to vacate the building, no matter how careful you are to always be careful of every piece of construction of the building.'' Hydrocyanic acid gas is defined as a ''dangerous or lethal chemical'' in the statutes dealing with licensing of those engaged in the pest control business (Bus. & Prof. Code, § 8513.) Bell testified on cross-examination that the gas

was generally used in the community, and that it is used for fumigating railroad cars, homes, apartments, and fruit trees, but as seen there are only three licensed operators in Sacramento.

Defendant Moore introduced a written notice which he claims was attached to the door of the pharmacy directing that he be contacted before entering the building because of possible gas leakage, indicating that he believed a leakage possible although he testified that he took every precaution to seal the basement before he released the gas. This evidence, as above discussed, clearly points to the conclusion that the gas escaped from the basement into the pharmacy although great care to prevent it was exercised by Moore. As before seen, the activity in releasing the gas was carried on in the basement of commercial buildings where there are a great many tenants. Under these circumstances we have a case which calls for liability without fault—a case falling within the category of what has been defined as the miscarriage of an ultrahazardous activity. It has been said: ''One who carries on an ultra-hazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultra-hazardous, although the utmost care is exercised to prevent the harm. . . . An activity is ultra-hazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage. . . . An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community. It does not cease to be so because it is carried on for a purpose peculiar to the individual who carries it on. Certain activities may be so generally carried on as to be regarded as customary. Thus, automobiles have come into such general use that their operation is a matter of common usage. This, together with the fact that the risk involved in the careful operation of a carefully maintained automobile is slight, is sufficient to prevent their operation from being an ultrahazardous activity. However, the use of an automotive vehicle of such size and weight as to be incapable of safe control and to be likely to crush water and gas mains under the surface of the highway is not as yet a usual means of trans-

portation and, therefore, the use of such an automobile is ultrahazardous.

"While blasting is recognized as a proper means of clearing woodland for cultivation and of excavating for building purposes, the conditions which require its use are usually of brief duration. It is generally required because of the peculiar character of the land and it is not a part of the customary processes of farming or of building operations. Likewise, the manufacture, storage, transportation and use of high explosives, although necessary to the construction of many public and private works, are carried on by a comparatively small number of persons and, therefore, are not matters of common usage. So, too, the very nature of oil lands and the essential interest of the public in the production of oil require that oil wells be drilled, but the dangers incident thereto are characteristic of oil lands and not of lands in general. . . . The rule stated . . . does not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier. . . . The rule stated . . . does not apply where the person harmed by the unpreventable miscarriage of an ultrahazardous activity has reason to know of the risk which makes the activity ultrahazardous and (a) takes part in it, or (b) brings himself within the area which will be endangered by its miscarriage (i) without a privilege, or (ii) in the exercise of a privilege derived from the consent of the person carrying on the activity, or (iii) as a member of the public entitled to the services of a public utility carrying on the activity. . . . (1) A plaintiff is not barred from recovery for harm done by the miscarriage of an ultrahazardous activity caused by his failure to exercise reasonable care to observe the fact that the activity is being carried on or by intentionally coming into the area which would be endangered by its miscarriage. (2) A plaintiff is barred from recovery for harm caused by the miscarriage of an ultrahazardous activity if, but only if, (a) he intentionally or negligently causes the activity to miscarry, or (b) after knowledge that it has miscarried or is about to miscarry, he fails to exercise reasonable care to avoid harm threatened thereby." (Rest., Torts, §§ 519, 520, 521, 523.) In the case of *Green* v. *General Petroleum Corp., supra,* an oil well had "blown out" due to natural gas pressure while in the process of being drilled, and plaintiff's property was damaged by debris being

cast thereon. The court declared the driller of the well to be liable although he had used all care possible to avoid the accident, and announced the rule that: "Where one, in the conduct and maintenance of an enterprise lawful and proper in itself, deliberately does an act under known conditions, and, with knowledge that injury may result to another, proceeds, and injury is done to the other as the direct and proximate consequence of the act, however carefully done, the one who does the act and causes the injury should, in all fairness, be required to compensate the other for the damage done." (P. 333.)

There is considerable discussion in the briefs about the doctrine of the English case of *Fletcher* v. *Rylands*, L.R. 3 H.L. 330, and the latest expression there apparently limiting the doctrine (*Read* v. *Lyons & Co.*, 1 All Eng. 106, see 35 Cal.L. Rev. 316) and whether it is in effect in California. Whatever the situation may be in that regard, there can be no doubt that the case of *Green* v. *General Petroleum Corp., supra,* enunciated a principle of absolute liability which is applicable to the instant case. It is not significant that a property damage, as distinguished from a personal injury, was there involved. The important factor is that certain activities under certain conditions may be so hazardous to the public generally, and of such relative infrequent occurrence, that it may well call for strict liability as the best public policy.

The above-quoted evidence shows that the use of gas under the circumstances presented is a hazardous activity; that it is perilous and likely to cause injury even though the utmost care is used; that defendant Moore knew or should have known that injury might result; and that the use of it under these circumstances is not a matter of "common usage" within the meaning of the term. In regard to the last feature it may be used commonly by fumigators, but they are relatively few in number and are engaged in a specialized activity. It is not carried on generally by the public, especially under circumstances where many people are present, thus enhancing the hazard, nor is its use a common everyday practice. It is not a common usage within the definition: "An activity may be ultrahazardous because of the instrumentality which is used in carrying it on, the nature of the subject matter with which it deals or the condition which it creates." (Rest., Torts, § 520(b), com. cl. (b).) ▮ And in this connection the instruction advising the jury that the usage was not common, was proper.

Moore claims error in respect to the refusing of instructions offered by him dealing with inevitable accident, negligence on his part and refuting the rule of strict liability. Manifestly such instructions are not appropriate in a case of strict liability.

Moore complains that the modification of an instruction offered by him was error. The instruction was: "The court instructs the jury that it was plaintiff's duty to exercise his faculties of sight and smell to apprise himself of danger and to use ordinary care at all times in exercising such senses. (To look in a careless manner, or to exercise his sense of smell in a careless manner, is not to look or smell at all.)" The court did not give the portion in parentheses. Assuming the instruction was applicable, it is clear the part given was sufficient.

Complaint is made of the refusal to give an instruction reading: "The court instructs you that no man is responsible for that which no man can control." Such an instruction would only lead to confusion in the type of case under consideration and is based on cases where there was common usage in the sense used in the Restatement.

Error is urged in the refusal to give Moore's instructions on contributory negligence of plaintiff phrased in the language used in an ordinary negligence case. Such an instruction was improper as seen from the foregoing discussion of what conduct on part of plaintiff bars his recovery, and was correctly covered by plaintiff's instruction No. 10 heretofore quoted.

Error is claimed in the refusal to admit in evidence the hospital records covering the time plaintiff was confined in the hospital. Not all of those records were excluded and in any event no proper foundation was laid. The law provides: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence *if the custodian* or other qualified witness *testifies* to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." [Emphasis added.] (Code Civ. Proc., § 1953f.) The sole foundation was the testimony of the custodian of the hospital's records, that they were the day to day records of

the patients in the hospital, including plaintiff. No evidence was offered as to the mode of preparation.

■ Finally Moore argues that the damages are excessive. The jury gave a verdict for $20,000. On motion for a new trial, that was reduced to $10,000 with plaintiff's consent. The contention is plainly without merit. Plaintiff was rendered unconscious by the gas. He testified that he was sick and his mind was hazy as to what was transpiring for several days thereafter. He was in the hospital 20 days and in bed at home for approximately two weeks. He had continued to suffer from headaches and weakness up to the time of the trial of this action in July, 1945. He did not return to work until the latter part of December, 1943. His heart misses beats and causes him anxiety. He has continual dripping down his throat and coughs considerably. He has lost 20 pounds in weight. He is not able to perform his work as he did before the injury. These things did not exist before the poisoning. Dr. Schofield testified that plaintiff had sinusitis as a result of the poisoning. Dr. Haworth testified to the sinus difficulty and that it was due to the poisoning; that it would cause headaches. Dr. Martin testified the conditions of nasal inflammation and upper respiratory tract inflammation existed in 1945. Dr. Buck, who examined plaintiff a year after the poisoning, stated the condition would continue for some time in the future. There is a conflict in the evidence but that was resolved by the jury and we cannot say that there is a showing that the amount awarded "shocks the court's sense of justice and raises a presumption that it was the result of passion and prejudice." (*Johnston* v. *Long,* 30 Cal.2d 54, 76 [181 P.2d 645].)

The judgment against defendant Moore is affirmed. Plaintiff's appeal is dismissed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.