98 Cal.Rptr.2d 820 (2000)
82 Cal.App.4th 1200
Martin WHITFIELD, Plaintiff and Appellant,
v.
HECKLER & KOCH, INC., Defendant and Respondent.
No. B134247.
Court of Appeal, Second District, Division Four.
August 9, 2000.
As Modified August 25, 2000.
Review Granted November 15, 2000.
*823 McNicholas & McNicholas, John P. McNicholas, Los Angeles, and Matthew S. McNicholas for Plaintiff and Appellant.
Holland & Knight, Charles L. Coleman III, Mark L. Venardi and Kimberly A. Gershon, San Francisco, for Defendant and Respondent.
CURRY, J.
Appellant Martin Whitfield is a Los Angeles police officer badly injured in a shootout with Emil Matasareanu and Larry Phillips, Jr., in front of the North Hollywood Branch of the Bank of America on February 28, 1997. Being heavily armed and attired in full body armor, Matasareanu and Phillips were able to hold off police officers for a considerable period of time while inflicting injury on police officers and civilians alike. Respondent Heckler & Koch, Inc., is one of ten named defendants alleged to have manufactured, distributed, marketed, or sold one or more of the weapons used by Matasareanu and Phillips in the shootout. The trial court sustained respondent's demurrer to the second amended complaint.
Although respondent's product was not defective in the usual sense, appellant asks that we adopt a new theory of liability to cover products which are unflawed in manufacture or design but which are so potentially dangerous that they should not be offered for sale to the general public unless the manufacturer is willing to internalize the cost of all injuries which result from the product's misuse. Failing that, appellant urges that traditional product liability and negligence theories be interpreted expansively to cover manufacture of certain types of legally produced firearms. We believe it would be unwise to adopt a broad new theory of recovery which would ultimately make courts and juries the arbiters of the merit of every consumer product in the market. We further believe such issues should be resolved by the appropriate legislative bodies. Accordingly, we affirm the trial court's order.

FACTUAL AND PROCEDURAL BACKGROUND

The Allegations of the Complaint
For purposes of this appeal from an order sustaining a demurrer without leave to amend, we accept the allegations of the complaint as true. In his second amended complaint, the operative complaint for purposes of this appeal, appellant alleged that among the various weapons used by Matasareanu and Phillips was a "Heckler & Koch .308 caliber semiautomatic assault rifle, model 91, with drum magazine" (hereafter HK .308).[1] The weapons were *824 allegedly used in their attempted robbery of the bank and their attempt to escape, during which nine police officers and two civilians were shot. Appellant was one of the first officers to arrive at the scene. One of the two assailants, believed to be Phillips, fired at appellant using one of the assault weapons and armor piercing bullets.[2] Appellant ducked behind his patrol car, but was nonetheless struck in the left forearm and left buttock, the bullet which injured his forearm having first traveled through the engine block, transmission, and body of the patrol car. After sustaining these injuries, appellant attempted to reposition himself behind a row of trees, and was shot in the right femur, the lesser trochanter, and the upper torso. As a result of these injuries, appellant has become permanently disabled.
According to the complaint, the weaponry with which Matasareanu and Phillips were armed allowed them to fire at rates in excess of 100 shots per minute, and a total of more than 1,200 rounds during the standoff.
The causes of action directed against respondent and the other gun manufacturers and distributors are for ultrahazardous products liability, strict product liability, negligent design product liability, and negligence. The ultrahazardous products liability cause of action, which the complaint conceded has yet to be judicially recognized, alleged that respondent and other defendants "designed, developed, sold, manufactured, warranted, advertised, delivered, marketed, and caused to be transported in interstate commerce" the firearms described above, as well as high capacity ammunition magazines. It alleged that the products were not abnormally altered beyond what the product manufacturers could reasonably have foreseen and caused a high degree of risk, harm, and serious injury.
The strict liability cause of action alleged that the weapons possessed defects in their design, development, manufacture, and distribution and that their use was reasonably foreseeable. The negligent design cause of action alleges that defendants were negligent in the design, development, manufacture, and distribution of the weapons and "their component parts, accessories, ammunition, enhancements, and paraphernalia," including failure to implement safety designs that would have prevented Matasareanu and Phillips from using and firing their weapons if acquired illegally.
The cause of action for negligence contends that respondent and other similarly situated defendants negligently distributed and delivered their products, including weapons, enhancements, spare parts, ammunition, and other paraphernalia without concern as to who would receive or purchase such products and "negligently flooded the market with their products allowing and/or assuring that they would be obtained illegally and by people engaged in the illegal gun market and by people engaged in crime." This cause of action further alleged that respondent and other similarly situated defendants were negligent for failing to monitor distribution or institute safeguards to prevent unlawful sales and for failing to use safety designs or features that would have prevented the use of their weapons by individuals who purchased the weapons illegally. These safety features were alleged to include "certain magnetically encoded bracelets or rings that must be worn by the user or the gun will not work."

*825 The Demurrer and Proposed Amendments

Respondent demurred to the second amended complaint on the grounds that the firefighter's rule precluded recovery by an injured police officer under these circumstances; section 1714.4, subdivision (b)(2) of the Civil Code precludes recovery for strict product liability; and the cause of action for design defect was uncertain. In his opposition, appellant contended that the firearm was specifically designed to handle ammunition that could penetrate all known police body armor and to fire rounds faster than any human could continuously squeeze the trigger, and designed so that it could easily be converted into a fully automatic weapon.
At oral argument, counsel for appellant conceded that the weapon had been legally purchased in Maryland. At the time it was purchased, weapons of its type were not banned in California. Appellant acknowledged it was modified by someone other than respondent after sale to make it fully automatic.
After oral argument, appellant asked the court to consider certain new allegations as if they had been included in the second amended complaint.[3] In these additional paragraphs, appellant alleged he was unaware that Matasareanu and Phillips were armed with automatic or semiautomatic weapons, and that because of his lack of awareness he pulled his car within 100 feet of the bank's entrance and stood behind it for protection. The new paragraphs stated that, when they saw the police, Matasareanu and Phillips abandoned their plan to rob the bank "and undertook the completely new and separate task of creating this country's largest single military style shoot-out ever attempted against police officers. The goal of this new plan, which greatly enhanced the risk on the scene and, in fact, created entirely new risks, was to shoot, maim and kill as many police officers and civilians as possible with their massive firepower...." The new paragraphs attempt to place the blame for this new plan on respondent's "superior military weaponry""[s]uch gun was designed to fire bullets faster than any human being could ever squeeze-and-release the trigger. Such gun was also designed as a military weapon to be used to suppress all small arms fire, penetrate all known body armor, and control the military battle field in hand-to-hand combat settings. [¶] ... [It] was also designed to be extremely accurate at distance, and built with very exacting specifications to be a superior piece of equipment] ... designed to be used in a para-military or military setting, [and] was designed to be modified into a fully automatic weapon, and ... kill as many people as possible in the shortest period of time."
The proposed amendments further state that "it was also foreseeable to [respondent] and any reasonable person that such incidents would occur...." Respondent allegedly "did not care how its product was marketed or distributed, nor whether it ended up in the hands of criminals to attack police officers. Additionally, [respondent] knew or should have known that its gun could be modified into a fully automatic weapon, would be used in crimes, and would be used to shoot, maim and kill people in a civilian setting."

The Trial Court's Order
The trial court sustained respondent's demurrer, concluding that the causes of action alleged in the complaint were barred "because the firefighter's rule precludes a police officer from recovering from a weapons manufacturer when the police officer is injured by intentional use of a gun by a bank robber." The court believed that the claims were also barred because section 1714.4, subdivision (b) of the Civil Code makes clear as a matter of legislative policy (1) that a firearm is not defective in design merely because of its potential to cause serious injury when discharged, and (2) that injuries resulting *826 from the discharge of a firearm are proximately caused by the actual discharge of the product, not its potential to cause serious injury. The court rejected appellant's invitation to recognize a new cause of actionultrahazardous products liability. The court was "naturally loathe to create a new cause of action because of the potential for unforeseen and unpleasant consequences" and was "not persuaded that new law is needed here, or that [the court] is the proper forum for the creation of a remedy against a weapon manufacturer." Concerning the design defect cause of action, the court pointed out that "nowhere does it explain in the complaint ... what designs or safety features exist or could exist that would prevent criminals from using guns...." The court further ruled that public policy bars claims against a gun manufacturer for a criminal's misuse of guns in a crime. Because firearms are already well-regulated by state and federal legislatures, any attempt to obtain judicial recognition of a theory which would result in "categorical liability" against gun manufacturers for all misuse of firearms would represent an improper use of judicial power. Moreover, the court believed, appellant's theory of liability would "expand[] the concept of proximate cause beyond all reasonable legal applications."
Appeal was taken from the judgment entered on the order sustaining the demurrer.

DISCUSSION

I

TORT LIABILITY
Our Supreme Court decided nearly 30 years ago in Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, that a person injured by a defective product did not need to rely on contractual theories, such as breach of express or implied warranty, to hold a remote manufacturer liable for injuries caused by a product. "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (Id. at p. 62, 27 Cal.Rptr. 697, 377 P.2d 897.) "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (Id. at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897.) The elements the plaintiff must prove were set forth succinctly in Greenman and have not changed substantially over the years: (1) "that he was injured"; (2) "while using the [product] in a way it was intended to be used";[4] (3) "as a result of a defect in design and manufacture ... that made the [product] unsafe for its intended use"; (4) "of which plaintiff was not aware...." (Id. at p. 64, 27 Cal.Rptr. 697, 377 P.2d 897.)
Appellant does not contend that the HK .308 was "defective" in the traditional sense of the word. The rifle was fully functional in the sense that bullets were fired accurately, over a long distance, with a considerable amount of force. Instead, appellant proposes that the product was defective for a unique reason. Appellant argues that a firearm with this weapon's potential for destructivenessi.e., capable of firing far faster than a human finger could squeeze and release the trigger,[5] of using clips which hold up to 200 rounds, and of projecting a bullet with sufficient force to go through an automobile and still injure someone standing on the opposite sideis inherently flawed because its purpose *827 is "to kill as many people in the shortest possible time" with no counterbalancing beneficial purpose. Ultimately, appellant believes, this rifle and others like it should be restricted to military use and not marketed or distributed to the general public at all.
With this as the basis for the product's "defectiveness," appellant seeks to fit a claim within the established theories of negligence and product liability. In addition, to the extent that traditional tort theories will not encompass liability in this circumstance, appellant espouses creation of a new cause of action for "ultrahazardous products liability." We now turn to a discussion of each of these potential bases for liability.

A

ULTRAHAZARDOUS PRODUCT LIABILITY
The concept of strict liability for engaging in ultrahazardous activities has long been recognized. In Green v. General Petroleum Corp. (1928) 205 Cal. 328, 270 P. 952, where an oil well suddenly erupted, showering the defendant's neighbor's property with oil and mud, the court held that liability would be imposed without proof of negligence. In Luthringer v. Moore (1948) 31 Cal.2d 489, 190 P.2d 1, the court explained the principle which underlay its holding in Green: "The important factor is that certain activities under certain conditions may be so hazardous to the public generally, and of such relative infrequent occurrence, that it may well call for strict liability as the best public policy." (Luthringer v. Moore, supra, at p. 500, 190 P.2d 1.)
The factors to be considered in determining whether a particular activity is abnormally dangerous or ultrahazardous are: "`(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.'" (SKF Farms v. Superior Court (1984) 153 Cal.App.3d 902, 906, 200 Cal. Rptr. 497.) Only a limited number of activities have been classified as ultrahazardous, including blasting with explosives in the vicinity of populated areas (Balding v. D.B. Stutsman, Inc. (1966) 246 Cal.App.2d 559, 564, 54 Cal.Rptr. 717), fumigating with industrial strength pesticide (Luthringer v. Moore, supra, 31 Cal.2d at p. 500, 190 P.2d 1), and crop dusting with toxic chemicals (SKF Farms v. Superior Court, supra, 153 Cal.App.3d at p. 905, 200 Cal.Rptr. 497). The act of discharging a firearm has been held not to constitute an ultrahazardous activity. (Orser v. George (1967) 252 Cal.App.2d 660, 672, 60 Cal. Rptr. 708, citing Jensen v. Minard (1955) 44 Cal.2d 325, 328-329, 282 P.2d 7 and Tucker v. Lombardo (1956) 47 Cal.2d 457, 463, 303 P.2d 1041.) Although these courts did not engage in extensive analysis, no doubt the fact that discharge of a firearm can be performed safely if a high degree of care is used and the fact that the activity of discharging a firearm is fairly commonplace influenced their holdings.
Appellant concedes that under these authorities respondent has not performed an abnormally dangerous activity by engaging in the manufacture and distribution of the HK .308. But appellant proposes the creation of a new theory of liability, which is described as follows: "All parties that manufacture, market, distribute, sell or otherwise aid in the delivery of a product to the public are held strictly liable if that product is specifically designed to be ultrahazardous when properly used and is ultrahazardous when so used, even though it comports with all design and manufacturing specifications, is legally produced, and may serve some social good." This theory, called Ultrahazardous Products Liability *828 (UPL), was set out in a 1997 law review article: McNicholas & McNicholas, Ultrahazardous Products Liability: Providing Victims of Well-Made Firearms Ammunition to Fire Back at Gun Manufacturers (1997) 30 Loyola L.A. L.Rev. 1557 (hereafter McNicholas).[6]
One flaw in the proposed theory is obvious. How can it be said that a firearm is "specifically designed to be ultrahazardous when properly used" and "ultrahazardous when so used" when, as we have already seen, discharge of a firearm has uniformly been held not to constitute an ultrahazardous activity? The article attempts to answer this question by the creation of a new test for ultrahazardous product: "(1) whether there is a high degree of risk of harm to person, land, or chattel in the product's designed use; (2) whether it is likely that the harm from the designed use of the product or modified product will be great; and (3) the inappropriateness of marketing the product or modified product to the general consumer public." (McNicholas, supra, at p. 1591, fn. omitted.) The first two elementslikeliness and magnitude of harmare already encompassed in the definition of ultrahazardous activity. The third element simply invites the court to make a value judgment about the product at issue, guns in this instance. The authors clearly believe that guns, or at least certain types of guns, should not be available for general use by the public. As they say elsewhere, "[t]he law cannot allow the manufacturers, distributors, wholesalers, and retailers of firearms, or any other party involved in the chain of distribution, to continue to market their products of mass destruction and death to the general public with impunity." (Id. at p. 1583.) While this might be a cogent argument to make to the Legislature for purposes of a debate on gun control legislation, it does not represent a viable legal standard.
This brings us to the more significant drawback to the proposed UPL theory. As stated, the authors intend for UPL to apply not just to guns, but to all products. Modern society is rife with products with no readily perceivable benefit when measured from a purely utilitarian standpoint, and consumers frequently become enamored of goods which present potential dangers to life and health well in excess of the function they serve. We can easily imagine products from sport utility vehicles to bacon double cheeseburgers being weighed and found wanting under the UPL criteria. We are not prepared to embrace a theory which would turn courts and juries into arbiters of which products are or are not "appropriate" to manufacture and sell in this country.
Moreover, the asserted purpose behind UPL is to remove weapons manufacturers "from their legal vacuum" and cause them to be "treated the same as all other product manufacturers who are held liable for the damages caused by their goods." (McNicholas, supra, at pp. 1561-1562.) "[A]s with other product manufacturers, firearm manufacturers would have to build into the product, or its distribution system, mechanisms to make the product safe for consumers, passive users, and especially innocent bystanders." (Id. at p. 1585.) We are not aware of any decision which places weapons manufacturers in a legal vacuum or relieves them of their duty to manufacture products which are as safe as technology permits. No known or imagined safety device can prevent a determined criminal from using a gun for illicit purposes, particularly where, as here, the weapon was purchased legally. The problem with appellant's claims is not that weapons manufacturers are given a free pass, but that appellant has failed to indicate how the manufacturers can be said to have engaged in conduct which society deems unlawful or wrongful under any recognized legal theory. It is to consideration of respondent's actions under these theories that we now turn.

*829 B

PRODUCT LIABILITY
Appellant gave little emphasis to traditional product liability either here or before the trial court. The reason is obviousproduct liability implicates a manufacturer only when the product "proves to have a defect that causes injury to a human being." (Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d at p. 62, 27 Cal.Rptr. 697, 377 P.2d 897.) The HK .308 had no defect in the context that term takes when applied to the legal doctrine of product liability. It was capable of being fired safely and accurately, the purpose for which it was designed. It was, in other words, a "well-made gun."
Of course, a product need not have a flaw in order to be adjudged "defective" for purposes of product liability. "A defect in design, such as lack of a safety device, may also give rise to strict liability...." (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1254, pp. 691-692; accord, Wright v. Stang Manufacturing Co. (1997) 54 Cal.App.4th 1218, 1228, 63 Cal.Rptr.2d 422 ["There are commonly three types of product defects. `First, there may be a flaw in the manufacturing process, resulting in a product that differs from the manufacturer's intended result.... [¶] Second, there are products which are "perfectly" manufactured but are unsafe because of the absence of a safety device, i.e., a defect in design.... [¶] The third type of defect ... is a product that is dangerous because it lacks adequate warnings or instructions.'"], quoting Brown v. Superior Court (1988) 44 Cal.3d 1049, 1057, 245 Cal.Rptr. 412, 751 P.2d 470.)
Appellant tried to bring his claim within the domain of design defect by alleging that the weapons involved in the shootout possessed defects in "design, development, manufacture and distribution." Later, in the proposed amendments, appellant alleged that the HK .308 was "designed to be modified into a fully automatic weapon...." The trial court sustained the demurrer to this cause of action because appellant failed to specify a defect which could support the claim,[7] and because the court believed it was barred by Civil Code section 1714.4.
We agree with the trial court on both counts. Although there is no requirement that a product liability or design defect claim must be pled with any particular degree of specificity, where the factual recitations fail to show plainly the connection between cause and effect, "the plaintiff must allege facts, albeit as succinctly as possible, explaining how the [defendant's] conduct caused or contributed to the injury. [Citations.]" (Bockrath v. Aldrich Chemical Co. (1999) 21 Cal.4th 71, 78-79, 86 Cal.Rptr.2d 846, 980 P.2d 398; see also Christensen v. Superior Court (1991) 54 Cal.3d 868, 900-901, 2 Cal. Rptr.2d 79, 820 P.2d 181 ["`[W]here the pleaded facts of negligence and injury do not naturally give rise to an inference of causation the plaintiff must plead specific facts affording an inference the one caused the others.'"], quoting Blain v. Doctor's Co. (1990) 222 Cal.App.3d 1048, 1066; 272 Cal.Rptr. 250, 6 Witkin, Summary of Cal. Law (2000 supp.) Torts, § 1247, pp. 430-431 ["It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident *830 that harmed the plaintiff (1) was of a kind that ordinarily occurs as a result of product defect, and (2) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution."].) The existence of a design defect in the HK .308 causing injury to appellant is not obvious from the facts alleged. The facts set forth in the complaint indicate that appellant's injuries were caused entirely by Matasareanu and Phillips, and that there was no product design which would have prevented those two from using the weapon for their illicit ends. Appellant needed to allege with specificity facts that would lead to the inference that a design defect existed.
Section 1714.4 of the Civil Code provides an alternate basis for sustaining the demurrer to this cause of action. That statute states in relevant part: "(a) In a products liability action, no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged. [¶] (b) For purposes of this section: [¶] (1) The potential of a firearm or ammunition to cause serious injury, damage, or death when discharged does not make the product defective in design. [¶] (2) Injuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product. [¶] (c) This section shall not affect a products liability cause of action based upon the improper selection of design alternatives."
By enacting the statute, the Legislature intended to foreclose use of the risk-benefit analysis discussed in Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443. In the facts underlying that case, the plaintiff was injured while operating a high-lift loader manufactured by the defendant. The Supreme Court held that the jury should have been instructed that a product is defective in design "either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of the relevant factors ..., the benefits of the challenged design do not outweigh the risk of danger inherent in such design." (Id. at p. 418, 143 Cal.Rptr. 225, 573 P.2d 443.) The court made clear that under the latter test, "a product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies `excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design. [Citations.]" (Id. at p. 430, 143 Cal. Rptr. 225, 573 P.2d 443, fn. omitted.) Under the risk-benefit analysis, the jury is to consider, "among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]" (Id. at p. 431, 143 Cal.Rptr. 225, 573 P.2d 443.)
As we read section 1714.4 of the Civil Code, the Legislature intended to preclude both courts and juries from engaging in any type of risk-benefit analysis when it comes to the design of firearms or ammunition. Put in terms of appellant's arguments, we are not permitted to consider whether a particular type of firearm is too powerful for any lawful purpose and poses too great a risk of injury when compared to the benefit to the consumer of having available an extremely powerful weapon at his or her disposal. This strikes at the heart of appellant's contention that the HK *831 .308's ability to penetrate an engine block and to fire accurately over long distances means that it was defectively designed.
Section 1714.4, subdivision (b)(2) of the Civil Code places another obstacle in the path of appellant's product liability claim. In that subdivision, the Legislature makes clear that proximate or legal cause of injury from a firearm is its actual discharge, not its potential for causing serious injury. This means that when determining causation, an essential element of the product liability claim as set forth in Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, the courts cannot lay blame on the potential of the weapon to be both powerful and accurate. The sole proximate cause of gun injuries, according the Legislature, is the person who discharges it at the victim.
Subdivision (c) of section 1714.4 provides an exception to the general exemption of weapons manufacturers from product liability for a "products liability cause of action based upon the improper selection of design alternatives." To appreciate the difference between a product "defective in design" for purposes of the exemption from product liability in subdivisions (a) and (b), and "improper selection of design alternatives" for purposes of the exception to the exemption in subdivision (c), we must take a step back to look at the theoretical underpinnings of the risk-benefit analysis set forth in Barker v. Lull Engineering Co., supra, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443. "Under this test, a product can be said to be defective in the kind of way that makes it `unreasonably dangerous' if a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. There are three primary reasons for so concluding: (1) the harmful consequences in fact from intended and reasonably foreseeable uses resulting from the way the product was designed and marketed up to the time of plaintiffs injury outweighed the benefits in terms of wants, desires, and human needs served by the product; (2) although the harmful consequences in fact did not exceed the benefits, alternative products were available to serve the same needs or desires with less risk of harm; (3) although the harmful consequences did not outweigh the benefits, there was a feasible way to design the product with less harmful consequences." (Prosser & Keeton, Torts (5th ed.1984) § 99, p. 699, fn. omitted.)
Civil Code section 1714.4 precludes us from analyzing weapons or ammunition under the first or second test. This means that we cannot reach the conclusion urged by appellant: that the HK .308 has no real beneficial purpose in terms of human needs served by the product or that any beneficial purpose it does serve could be just as easily met by an ordinary handgun or rifle. Under subdivision (c), however, courts can consider whether a feasible design alternative existed which would have prevented the harm that befell the victim. "An alternative design that was not utilized is to be considered as feasible when a reasonable person would conclude that the (1) magnitude of the danger-in-fact that could have been avoided by such alternative design in the (2) utilization of the scientific technological know-how reasonably available to the defendant outweighed the (1) financial costs of guarding against such avoidable danger, (2) the impairment of the benefits, and (3) any new danger-in-fact that would have been created by the alternative design." (Prosser & Keeton, Torts, supra, § 99, p. 700; accord, Buccery v. General Motors Corp. (1976) 60 Cal.App.3d 533, 547, 132 Cal.Rptr. 605 ["[A]ny product so designed that it causes injury when used or misused in a foreseeable fashion is defective if the design feature which caused the injury created a danger which was readily preventable through the employment of existing technology at a cost consonant with the *832 economical use of the product."]; Baker v. Chrysler Corp. (1976) 55 Cal.App.3d 710, 716, 127 Cal.Rptr. 745 ["[T]he reasonableness of an alternative designwhether the design can actually be produced, the materials for production are available, the costs are not prohibitive, etc.is a factor to be considered in determining whether the design which was actually used can be characterized as defective. [Citation.]"].)
Put another way, as long as we avoid undertaking a risk-benefit analysis based on the potential of a particular weapon or particular kind of ammunition to cause serious injury, damage, or death, courts can examine whether some novel technological advancement exists which would allow for a safer alternative design. As we have said, however, appellant has not described in his complaint, and we are not aware of, any available safety device which would prevent this type of purposeful criminal activity by persons who lawfully purchased the weapons. Thus, the exception in subdivision (c) is of no benefit to appellant.

C

NEGLIGENCE
Because of these obstacles to a product liability claim, appellant asks us to analyze respondent's culpability under ordinary principles of negligence.
"Actionable negligence is traditionally regarded as involving the following: (a) a legal duty to use due care; (b) a breach of such legal duty; (c) the breach as the proximate or legal cause of the resulting injury. [Citations.]" (6 Witkin, Summary of Cal. Law, supra, § 732, p. 60.) The question here is whether respondent owed appellant a duty of care. "The determination of duty is primarily a question of law. [Citation.] It is the court's `expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' (Prosser, Law of Torts (4th ed.1971) pp. 325-326.) Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. [Citation.] While the question whether one owes a duty to another must be decided on a case-by-case basis, every case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct. [Citation.] [F]oreseeability of the risk is a primary consideration in establishing the element of duty. [Citation.]" (Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 46, 123 Cal.Rptr. 468, 539 P.2d 36, fn. omitted.)
"However, foreseeability alone is not sufficient to create an independent tort duty. `"Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." [Citation.]' (Burgess v. Superior Court (1992) 2 Cal.4th 1064, 1072 [9 Cal. Rptr.2d 615, 831 P.2d 1197]) Because the consequences of a negligent act must be limited to avoid an intolerable burden on society [citation], the determination of duty `recognizes that policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk.' ([Elden v. Sheldon (1988) 46 Cal.3d 267, 274, 250 Cal.Rptr. 254, 758 P.2d 582], fn. omitted.) `[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which the foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury.' (Thing v. La Chusa (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814]) In short, foreseeability is not synonymous with duty; nor is it a substitute." (Erlich v. *833 Menezes (1999) 21 Cal.4th 543, 552, 87 Cal.Rptr.2d 886, 981 P.2d 978.)
In Rowland v. Christian (1968) 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561, the Supreme Court set forth the now well-known factors thought to be of some assistance in ascertaining whether a legal duty exists: "[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved. [Citations.]"
Appellant seems to believe it is a simple matter to plug the facts in this case into the Rowland v. Christian formula and come out with a finding of the existence of a duty of care, particularly if we share his personal assessment that weapons manufacture is, per se, an immoral business. We do not agree. To impose ordinary negligence liability on a manufacturer who has done nothing more venal than produce an unflawed, albeit potentially dangerous, product would expand the concept of duty far beyond any current models. Appellant cannot point to a single case where a manufacturer of an unflawed and legal product has been found to have violated a duty of care owed to a person injured by the product.
Generally speaking, the court may not impose a duty on the owner or manufacturer of the instrumentality where the injuries were caused by the criminal actions of a third party. The seminal case in this regard is Richards v. Stanley (1954) 43 Cal.2d 60, 271 P.2d 23, where the defendant left her car on a public street in San Francisco "`unattended and unlocked with the ignition key in said car lock'...." (Id. at p. 61, 271 P.2d 23.) A thief took advantage of the situation to steal the car, and, while driving the stolen car, struck the plaintiff. Affirming a judgment for nonsuit, the court emphasized that "when [defendant] left the car it was in a position where it could harm no one, and no harm occurred until it had been taken by a thief. Thus a duty to prevent such harm would involve more than just the duty to control the car, it would involve a duty to prevent action of a third person. Ordinarily, however, in the absence of a special relationship between the parties, there is no duty to control the conduct of a third person so as to prevent him [or her] from causing harm to another. [Citations.]" (Id. at p. 65, 271 P.2d 23.)
The Supreme Court found special circumstances present in Richardson v. Ham (1955) 44 Cal.2d 772, 285 P.2d 269, where a contractor left a bulldozer unlocked and several intoxicated men started and drove it, and abandoned it when they found they could not stop it. The bulldozer caused massive destruction to property in its path. The court distinguished Richardson on the grounds that the bulldozer aroused curiosity, attracted spectators, and was attractive to children, and it was, therefore, reasonably foreseeable that it would be tampered with. In addition, the likelihood that someone tampering with an unattended bulldozer would know how to operate or stop it was small. The recent case of Avis Rent a Car System, Inc. v. Superior Court (1993) 12 Cal.App.4th 221, 15 Cal.Rptr.2d 711, summarizes the relevant case law in this area and points out that all cases in which liability was said to exist involved some sort of special circumstances, such as when a dealer regularly left cars unlocked with keys in the ignition to encourage the general public to inspect and test drive the cars without supervision. (See id. at p. 230, 15 Cal.Rptr.2d 711.) Appellant attempts to rely on Richardson, but can *834 point to no special relationship or special circumstances which would remove this case from the general rule of nonliability for the actions of third parties.
In the final analysis, since courts are in no position to make a value judgment on the usefulness of guns in our society, a decision on whether certain types of weapons should be made available to the general public must rest with the appropriate legislative body. Our Legislature, by its passage of the Roberti-Ross Assault Weapons Control Act of 1989 (AWCA) (Pen.Code § 12275 et seq.; see Stats.1989, ch. 19, § 3, p. 64) and the amendments signed into law by Governor Davis in 1999 (Stats.1999, ch. 129, § 7 et seq.), has made clear that it is attuned to the issue which is the crux of this litigation: the sale of assault weapons to the general public. In enacting the AWCA, the Legislature found that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state." (Pen.Code § 12275.5.) The Legislature expressly recognized the problem identified by appellant herethat assault weapons have "such a high rate of fire and capacity for firepower that [their] function as a legitimate sports or recreational firearm[s are] substantially outweighed by the danger that [they] can be used to kill and injure human beings." (Ibid.) The AWCA restricts the manufacture, sale, and possession of "assault weapons"a category of firearms subject to continual revision and expansion under a procedure set forth in section 12276.5 whereby the Attorney General can petition the superior court to declare a particular firearm an assault weapon because of its essential similarity to a specifically listed weapon. In addition, the 1999 amendment defines assault weapons according to certain generic characteristics which will no doubt lead to further restrictions in this area.
In Easier v. Lockyer (2000) 23 Cal.4th 472, 97 Cal.Rptr.2d 334, the Supreme Court upheld the AWCA against constitutional challenges based on the equal protection and separation of powers doctrines, noting that "[t]he crisis created by the proliferation and use of assault weapons" was the subject of the special legislative session at which the statute was enacted, and that the Legislature sought to address in the AWCA "the grave threat to public safety posed by the possession and use of assault weapons by criminals...." (Id. at pp. 482, 487, 97 Cal.Rptr.2d 334, 2 P.3d 581.) In its opinion, the court described atrocities committed by criminals armed with semiautomatic weapons which provided the context in which the AWCA was enacted. These included the 1989 incident at an elementary school in Stockton in which five children were killed and dozens more were wounded, and the 1984 incident at a McDonald's restaurant in San Ysidro in which the gunman ordered all the patrons to lie on the floor and killed 21 of them while wounding 15 others. (See id. at pp. 482-487, 97 Cal.Rptr.2d 334, 2 P.3d 581.) In view of the ongoing legislative efforts to deal with the evils which led to the type of incident in which appellant was injured, we see no current need for the judiciary to intrude.

II

THE FIREFIGHTER'S RULE
The firefighter's rule presents yet another impediment to appellant's claims. "Briefly stated, in California the firefighter's rule prohibits a peace officer from recovering for injuries caused by the very negligence `which created the risk which necessitated his presence.' [Citation.] ... By statute, the firefighter's rule does not bar recovery where the injury was caused by `willful acts,' or lack of `ordinary care or skill in the management of the person's property or person' where `the conduct causing the injury occurs after the person knows or should have known' of the officer's presence. (Civ. *835 Code, § 1714.9, subd. (a)(1).)" (Kelhi v. Fitzpatrick (1994) 25 Cal.App.4th 1149, 1157, 31 Cal.Rptr.2d 182.) In addition, "the rule does not apply to conduct other than that which necessitated the summoning of the firefighter or police officer, and it does not apply to independent acts of misconduct that are committed after the firefighter or police officer has arrived on the scene. [Citations.]" (Neighbarger v. Irwin Industries, Inc. (1994) 8 Cal.4th 532, 538, 34 Cal.Rptr.2d 630, 882 P.2d 347; Calatayud v. State of California (1998) 18 Cal.4th 1057, 1063, 77 Cal.Rptr.2d 202, 959 P.2d 360.)
Appellant is a police officer, called to the scene of the robbery of the bank and to apprehend Matasareanu and Phillips. He seeks to avoid the implications of the firefighter's rule by alleging that respondent was liable for a defective product which independently caused his injury and that the assailants, when they emerged from the bank, "abandoned their plan to rob the bank and undertook the completely new and different task of creating this country's largest single military style shoot-out ever attempted against police officers."
Even assuming appellant has a viable claim for product liabilitywhich, as we have explained, he does notthere is no general exception to the firefighter's rule for product liability actions. The case appellant chiefly relies on, Stapper v. GMI Holdings, Inc. (1999) 73 Cal.App.4th 787, 86 Cal.Rptr.2d 688, does not stand for the proposition that there is a blanket exception for suits against the manufacturers of malfunctioning products. In Stapper, firefighters were positioned in the garage of a burning home, attempting to douse the flames with their hose. Someone closed the door to the garage, probably by use of a remote control. Trapped inside the smoke filled garage, one firefighter died and another suffered permanent brain damage. The theory behind the suit brought by the surviving firefighter was that the automatic door opener device was defective because it was not supposed to allow the door to close when anything bigger than one and one-half inches was in its way, and the diameter of the hose being used by the injured firefighters was at least two inches. The trial court granted a defense motion for nonsuit on the ground that "`the risk of a malfunctioning garage door opener or anything else is reasonably associated with a fire.'" (Id. at p. 790, 86 Cal.Rptr.2d 688.) The appellate court disagreed: "[Plaintiff] does not complain of negligence in the creation of the fire, but rather seeks damages for acts that allegedly occurred independent of the fire. [Defendant's] alleged negligence did not make [plaintiffs] employment necessary nor was it the occasion for her presence at the [burning] home." (Id. at p. 792, 86 Cal.Rptr.2d 688.)
The court in Stapper distinguished the earlier case of Bay Area Rapid Transit v. Superior Court (1980) 113 Cal.App.3d 1018, 170 Cal.Rptr. 390 (BART), in which firefighters had been injured while battling a blaze in a BART tunnel. Plaintiffs alleged their injuries were caused by improperly functioning ventilation systems, communications systems, and rescue apparatus. (Id. at p. 1022, 170 Cal.Rptr. 390.) The court in BART concluded that since the injuries were caused by "the byproducts of the conflagration, namely, the smoke and fumes from the fire, which [the plaintiffs] inhaled," the firefighter's rule was "squarely applicable" despite these allegations. (Ibid.) "The complaints concede that real parties were called into the tube to extinguish the fire, prevent damage to BART's property, and to rescue members of the public, all common and foreseeable firefighting activities." (Ibid.) The court in Stapper believed that the BART decision was not applicable because the defective conditions alleged by the plaintiffs in BART did not "`result[ ] from an independent tortious act which occurred after the firefighters arrived at the scene.' [Citation.]" (Stapper v. GMI Holdings, Inc., *836 supra, 73 Cal.App.4th p. 795, 86 Cal. Rptr.2d 688, quoting Lipson v. Superior Court (1982) 31 Cal.3d 362, 369, fn. 4, 182 Cal.Rptr. 629, 644 P.2d 822.)
Unlike the court in Stopper, we do not find ourselves faced with injuries from a tortious act independent of that which brought the police officers to the scene of the bank robbery. The risk of getting shot while attempting to apprehend criminals is, unfortunately, an inherent part of a police officer's duties. As police officers are obliged to do time after time, appellant bravely placed himself in harm's way by confronting armed assailants who posed a threat to innocent lives and property. The fact that the particular weapons used were more powerful than those used by the average bank robber and more powerful than those appellant expected represents a difference in degree of risk but not in the nature of the risk faced. Just as a firefighter cannot fit himself into an exception to the rule when chemicals to which he is exposed turn out to be more hazardous than he anticipated (Rowland v. Shell Oil Co. (1986) 179 Cal.App.3d 399, 224 Cal. Rptr. 547), a police officer does not bring himself outside the rule by alleging that the gunfire he faced was unexpectedly powerful.
Appellant attempts to bring himself within an exception by alleging that Matasareanu and Phillips altered their plans from bank robbery to "military style shoot-out" when they emerged from the bank is equally unavailing. First, given the well-known facts of the case, it is difficult to see how appellant can make this allegation. Matasareanu and Phillips were covered nearly head to toe with bulky, bullet-proof body armor when they arrived at the bank, and were armed, as the complaint alleges, with numerous pieces of assault-style weaponry. Clearly, their plans never included a quick bank job and inconspicuous getaway but were instead dependent on overpowering police officers with their superior weaponry and defensive equipment. In any event, the actions of third parties does not alter respondent's liability. Respondent's contribution to the incident took place months or years earlier when the weapons were manufactured and distributed. That Matasareanu and Phillips decided to engage in new and independent willful actions which brought them squarely within the exception set forth in Civil Code section 1714.9, and increased the risks to police officers at the scene, cannot have any impact on respondent's culpability.

DISPOSITION
The judgment is affirmed.
CHARLES S. VOGEL, P.J., and HASTINGS, J., concur.
NOTES
[1] The assailants were also alleged to have been armed with a "Baretta 9 mm pistol, model 925S"; a "Bushmaster .223 caliber, 5.56 mm assault rifle, model XM15-E2S, equipped with a 100 round drum magazine"; a "Norinco 7.62x33mm caliber assault rifle, model 56S-1"; a "Norinco 7.62x33mm caliber assault rifle, model 56S, equipped with a 100 round drum magazine"; and another "Norinco 7.62x33mm caliber assault rifle, model 56S...." All of these weapons were alleged to have been "functioning in both semiautomatic and fully automatic modes...."
[2] The bullets were allegedly manufactured and sold by the DOE and ROE defendants.
[3] Respondent stated no objection to consideration of these proposed allegations.
[4] The injury may also arise from a third party's use of the product in the way in which it was intended.
[5] As we have seen, appellant conceded that the weapon was modified sometime after its manufacture and sale to make it fully automatic. It was manufactured to be a semiautomatic.
[6] The co-authors of the article represent appellant herein.
[7] The only specific safety devices the weapons allegedly lacked were described in the complaint as "certain magnetically encoded bracelets or rings that must be worn by the user or the gun will not work." We do understand that any such devices have actually been developed for current use. Nor do we see how such devices would have prevented Matasareanu and Phillips from using the gun, since they were the original owners of the HK .308, having purchased it legally in another state. In any event, appellant does not press that aspect of the claim on appeal.